## MYERS et al. v. HAMLIN et al.

No. 19330. Opinion Filed Sept. 16, 1930.

Dale, Brown & Hoyland, for plaintiffs in error.

John Adams, for defendants in error.

BENNETT, C. This is a suit in the district court of Logan county, Okla., to set aside deeds dated August 28, 1925, made by John D. Hamlin, a widower, of Crescent, Okla. These deeds conveyed about 280 acres, being all of grantor's lands in Logan and Kingfisher counties. The grantees in these deeds were all of the sons and all the daughters of grantor, except Minnie Hamlin Myers. Grantor also had the following grandchildren: Glen Siddens and Leo Tuttle, children of grantor's deceased daughter, Mary Siddens, and Quvee Johnson, daughter of grantor's deceased daughter, Maggie Johnson.

The suit is based upon the contention that John D. Hamlin was physically ill and mentally incapable of making a valid transfer; that John A. and William H. Hamlin conducted the business of grantor, who lived with John, and that a fiduciary relation existed between the father and said sons, who fraudulently influenced him in making said transfers.

John D. Hamlin died October 28, 1926, more than a year after the execution of the deeds, and this suit was filed December 9th of the same year; Cora Streit and Rosa Swartz, named as grantees in said deeds, joining plaintiffs in their suit to vacate

said deeds. The grantor was 67 years of age at the date of the deeds.

Counsel for plaintiffs in his opening statement indicated that the whole case would turn upon the mental capacity of said grantor at the time he made the deeds. The petition indicates that that issue was treated as determinative, but we prefer to pass on the case upon the theory that the issue of confidential relations was not only relied upon but pleaded.

The petition, appropriate both in form and substance, alleged that the conveyances were without consideration except that a small consideration was paid by John A. Hamlin for a certain 40 acres conveyed to him, but that this 40 was worth much more than the consideration paid. The answers were, in effect, general denials, with, however, an admission as to the blood relationship of the parties as hereinbefore indicated. The cause was tried as one in equity to the court without a jury, who found generally for the defendants and against the plaintiffs, who thereupon bring this case here for review.

Two assignments of error are presented: First, that certain competent evidence of plaintiffs was excluded; second, that the judgment is contrary to law and the evidence in the case. The second assignment is subdivided into three contentions: (a) That the grantor was mentally incompetent to execute the deeds; (b) that there was a fiduciary relation existing between grantor and his two sons, William and John A.; (c) that defendants failed to prove and were not required to prove that the grantor had independent advice in making deeds, and that said sons had taken no advantage of their influence, and that the transaction was fair and conscientious.

Proposition No. 2 is argued first, and is properly treated by plaintiffs as of paramount importance and is given the major portion of their attention in briefs and argument, and we shall treat the contentions in the same order.

The evidence, as a whole, went in at the trial with comparatively few objections. The parties and their counsel appeared to desire a decision of the cause upon its merits. While the record is voluminous, most if it is directed at real issues of fact.

It will be impossible, within the limits to which this opinion should be confined, to quote at length from the testimony of the various witnesses. It might be said, however, that the evidence of many of these witnesses does not differ largely as to the essential facts. More than 30 witnesses testified for plaintiffs, most of whom gave evidence as to their opportunity for observing and understanding the physical and mental condition of John D. Hamlin and expressed their opinions as to his capacity to execute the deeds in question. The observation periods of these witnesses are vast and varied, some of them extending as far back as 1889, others over a few months only. Some of the witnesses were neighbors and closely associated with the grantor for long periods and others knew him casually only and for briefer periods.

The grantor, during a rather long life, seems to have availed himself of the services of medical men but once. This was in a serious illness in March, 1924, when the grantor suffered a stroke of paralysis, or from a condition which might lead to apoplexy. The patient was under the observation and treatment at that time of two physicians, Dr. John O. Butler and Dr. W. A. Kendall, both of Crescent. This illness, and its effect upon Mr. Hamlin with respect to his mental as well as his physical condition, were treated by many witnesses in the case as the pivotal or turning point, many witnesses indicating that due to this attack and his condition thereafter, John D. Hamlin was not capable of transacting business. Other witnesses were equally positive that though the illness was severe, it did not affect his capacity to understand business transactions. Each of these medical men came to a different conclusion and their evidence is directly at variance. The plaintiffs called Dr. Butler as their first witness, the defendants called Dr. Kendall as their first witness, and since it is impracticable to discuss or quote in detail from the evidence of each of the many witnesses, we have decided to set out enough of the substance of the evidence of each of these witnesses to make their positions clear, and we might say that the evidence of each of these witnesses is typical of much of the testimony offered on the respective sides of this controversy.

Dr. Butler testified that he treated Mr. Hamlin for a short period in March, 1924, for hardening of the arteries and apoplexy; that the patient was very nervous, had pain in his head, some temperature and nausea. Witness had information to the effect that patient suffered a slight stroke some years before while in Kansas, but that he was convinced that the first stroke was not severe enough to leave any trace or after-effect, but that the sickness of March, 1924, resulted

in some paralysis and some disturbance of patient's speech for a while and a weakening of his mentality; that after a few days patient got up and witness had no occasion to treat or observe him further, but did see him about town, and witness knew that he made visits to his children; that patient was weaker in body and mind than formerly; was nervous and trembly and that his mind was more like that of a child; that patient recited over and over stories of his hunting trips and of his childhood; that he had fairly good use of his hands, but walked like an old person; that he could feed himself and take care of himself in every way; that after the sickness Mr. Hamlin visited Arkansas one or more times, and would be gone for months during which witness would not see him; but while he was in Crescent he was down town every day talking to people just as he was accustomed to do before his illness; that prior to this illness witness saw no evidence that he had ever had a prior stroke. The following question was asked of witness:

"Q. What effect did it (the sickness of March, 1924) have on his mental capacity? A. (After exceptions) Well, I couldn't answer that. I could only say that I noticed a change in his speech and in his conversation, and in his nervous condition."

Later the witness testified that the patient's mentality reminded him of that of a boy six or eight years of age.

Dr. W. A. Kendall, for defendants, testified that he had been a practicing physician for 37 years residing in Crescent; that he had personally known John D. Hamlin for 35 years; had attended his family professionally throughout that time, but had not treated Hamlin personally until he was called in consultation by Dr. Butler at the time of the illness in March, 1924; that patient's condition at that time was bad. The trouble seemed to be with his kidneys. The urine showed quantities of sugar and albumen. Witness discussed the case with Dr. Butler. They decided that his trouble arose from his kidneys, and that if no relief were obtainable he was liable to die at any time. Witness and Dr. Butler had heard of a prior stroke to patient in 1919, but no effects of that stroke were observable. Witness examined patient closely and decided he was liable to have uraemic convulsions and die. The condition might result in paralysis. About a week thereafter witness saw patient on the street. He looked pretty well. He showed no more than ordinary symptoms of paralysis. Saw him and frequently talked with him often on the street. Witness knew

patient about as well as one neighbor could know another.

Witness said, in substance, that he observed no difference in the patient's mind after his sickness in March, 1924. Judging from conversations had with him, and observations made of him, witness thought his mind was as good after as before sickness. He had a good memory and a bright mind. Witness talked with him a great deal about business after that sickness. Talked with him about the disposition of his property. Told witness that he was thinking about fixing up his business, and explained that he was going to make deeds for that purpose; that he preferred that to making a will. He told witness that he was delaying making the deeds because he was on some notes, and if he deeded his lands away it would be said that he had done this to avoid paying his obligations, but that, as quickly as he could get those fixed up, he would make the deeds. Witness indicates that Hamlin was a man of sound sense with respect to business; was above the ordinary in keeping his business straight, and he told witness at one time that he had his business all straight as far as he knew, and had money enough to keep him, and had his tombstone fixed up. Asked as to his opinion with respect to Hamlin's mind at the date of the transfer, witness indicated that he had sufficient mind, not only to understand the transfer itself, but also to know which of his connections deserved to be remembered and which did not in the transfer. There is also reference in the evidence of this witness to the facts concerning the Myers note, but the parties are not referred to by name.

The undisputed facts in this case are that John D. Hamlin had for sometime practically retired from active business. He kept a bank account upon which he drew checks from time to time. A good many of these checks were made out for him by his banker. Some were made out by members of his family, including Will Hamlin and John Hamlin, and several of the checks were introduced purporting to be signed by himself, some by Will Hamlin and others by John, but nothing irregular appears in them, either in their purpose, execution or amount, nor is it strange that he should have had others do much of his writing, since his own right hand was affected. These checks appear to have been for the payment of necessary items for the most part, and it is nowhere indicated that any of his money found its way into the hands of those who are in any way assailed here. The old gentleman spent a great deal of his time sitting around talk-

ing with his friends in Crescent, and making perhaps two or three extended visits a year to Arkansas where he would go on hunting expeditions. He was always a great hunter and fisherman, and he was on such a trip at the date of his final illness. He made occasional visits to the homes of his children. He boarded a while with Minnie and a while with Will and a while with John, and perhaps others, but it is significant, and we think characteristic of him, that he paid them promptly by the month for his keep. He was very correct in his business obligations, never overdrew his account by so much as a penny, and always seemed to know his balance in bank. Sometime before executing the deeds in question, he became surety on a note of Claude Myers, the husband of Minnie. The undisputed evidence is that at maturity, Claude, the principal, did not pay it, and did not respond to the notices of the bank. John D. Hamlin, being then in Arkansas, forwarded his check for $450 to be paid to the bank on said note, and in some way took over the truck held by them as security. This and one other circumstance produced friction between Hamlin and Myers, which later developed into sharp words between Mrs. Myers and her father.

There is other evidence in the record tending to show that this unfriendliness was not lost on John in the disposition of his property. The evidence is not entirely clear as to why the grantor did not make his two Siddens grandchildren beneficiaries, but we think it sufficiently appears that their mother, Mary, eloped with and married her first cousin, A. G. Siddens, many years ago. After Mary's secret marriage, she never communicated with her people nor visited them, nor did they visit her, nor did they know, in fact, where she was until after her death. What must have been the bitterness arising from this situation! It seemed an irrevocable abandonment of her own people, and if she had lived, probably she would neither have claimed nor expected anything at the hands of her father. It is lamentable that human nature is not uniformly generous enough to overlook and to forgive a circumstance like this, but we must deal with human nature as it is rather than as it should be. There might have been sound business reasons why Quvee Johnson was not provided for. It is observable that her father, Walter Johnson, was introduced as a witness for the plaintiffs and testified that he was well acquainted with John D. Hamlin, who was at witness' home when Maggie Hamlin Johnson died, and that he saw his father-in-law at the funeral the next day.

Witness indicated that Hamlin was feeble, but he does not intimate that his mind was affected in any way. This is significant. He does indicate, however, that it was witness' preference that his daughter should not be mixed up in the litigation, and he uses this language as his reason therefor: ·

"I always thought when anybody made a will or deeded their property away, that was their business and they ought to know what they are doing. Q. And for that reason you objected to your daughter becoming a party plaintiff to this action, A. Yes, sir."

In answer to a question as to his financial condition, he said that he owned a farm of 160 acres in Kingman county, Kan. Enough other facts are stated to warrant the fair inference that he owns now real estate of the value of $12,000 or $15,000. Quvee appears to be his only child, and perhaps is better off prospectively than those who took benefit under the deeds assailed here.

This record discloses that Hamlin had raised and taken care of a large family and given them reasonable advautages. Many things point to the conclusion that he was frugal, industrious, and saving to a degree, with a mind constantly fixed on husbanding his resources to meet any possible obligations, and so that he might pay his own way as he went, and with an eye always toward the financial well-being of those around him. So careful was he that he seems to have bought and paid for a marker for his tomb. He would not make the deeds in question until every note on which he was bound, whether as principal or surety, was paid, for fear that it might be said, as he expressed it, that he was attempting to deed his property to get out of his debts.

A number of witnesses for the plaintiffs indicate that the old gentleman had the mind of a child, but such careful forethought, prudence, and the observance of the strictest scruples as to his obligations, and his forbearance to take any step until his debts were paid negatives, in our opinion, any such appraisement of his mental condition. Many of the witnesses for plaintiffs seem to base their judgment upon acts of Mr. Hamlin four, five, or six years prior to his last sickness. Plaintiffs' medical man, Butler, by his evidence, refutes their conclusions, and the evidence of several other of plaintiff's witnesses indicates clearly that they would not have questioned the old man's ability prior to his sickness of March, 1924. In short, even plaintiffs' testimony is contradictory, and some of it appears to have been based upon the idea that the old man had

not dealt justly in the disposition, rather than that he did not have the mental capacity to execute the deeds. Many times it was asked by plaintiffs, in substance, if the witness thought that the grantor had sufficient mind to understand the making of deeds to the grantees and the full and final effect of making of such gifts. The question might be understood as intimating that the witness ought to pass on the wisdom of the transfer and not chiefly upon the ability of the grantor to make a valid transfer.

Many of plaintiffs' witnesses seem to base their opinions as to the mental grasp of grantor upon the fact that he recounted over and over again with evident relish his exploits in the field with gun and rod, and that he told of these fishing trips of his until they became either disgusted or doubtful of his sanity. We hardly believe that this incident carries with it as much weight as it is thus apparently given. It is common knowledge of the writer, and he believes of people generally, that men who have as their hobby fishing and hunting invariably exploit their prowess over and over again to family and friends, and strangers alike, and it seems that in exceptional cases they exaggerate slightly their accomplishments. They live over again their pleasant hours by recounting the details, and to those who understand the flare for the field and stream, this is by no means either an indication of their mental insufficiency or lack of balance; nor is it in all cases an exact measure of the power of the narrator to deal in verities, naked and undefiled. But to those who have never marched out with gun and dog on a frosty morning and seen the world at its best, or who have not pushed their small boat out into the stream and lured by a decoy a wary bass from his haunts, these stories all become a burden, and they have no part in them, nor with those who dispense them. The old man was a rugged citizen who spent months and months each year in Arkansas pursuing his chosen diversion and hobby. There is in the record no single instance of where he made a bad investment, or was on the losing end of any business transaction, save when he loaned his credit to an unappreciative son-in-law. Hamlin was a sort of lone wolf, making his own way, paying his own bills, and blazing his own path after the death of his wife and after his children had grown up round about him. It is urged that he made his home with John. The record is contradictory as to this. He lived with John a while, of course, and a while with Minnie, and with others, and always paid his board and keep by his own checks on his own bank

account, and the many witnesses for the defendant indicate that the old man had a hard head and a way of doing things for himself. No instance is shown in the record where John or Will, or any of his other children, ever influenced him to do anything against his will or tried to do so.

There was no secrecy about the transfers. The old gentleman talked for months to his neighbors and friends about the transfer and why he was making it by deed rather than by will. When the deeds were made, they were promptly recorded; no apologies were offered, nothing hidden. The attack on these instruments was held in leash until the old man died and could not himself defend his acts. Defendants' witnesses are his bankers, several in number, the notary public who wrote the instruments and who details the circumstances fully, many farmers living near the old homestead and many neighbors in Crescent, at which place he spent considerable of his time, and all agree on one thing—that they had never at any time seen the old man when he was not in his right mind.

Some of the proof on the part of plaintiffs was by deposition and some by stipulation. As to these matters, the viewpoint of this court is as good in measuring and weighing that evidence as that of the trial court; but, in dealing with the evidence introduced from witnesses at the trial court, that court has an advantage not to be despised. Witnesses were before that court, they could be seen and heard, and their demeanor observed—no mean aid in the ascertainment of truth. The issue was clearcut; the trial court heard this matter with patience and with fine assistance from the attorneys on either side, who presented the matter orally two or three times before the court, who found generally for the defendants.

Upon examination of this evidence and of this record, which the writer has read from cover to cover and some of it repeatedly, together with all the briefs, we are of the opinion that the trial court has come to a proper conclusion, and while certain evidence was excluded by the trial court which might properly have been admitted, nevertheless, this evidence is here in court, and we have read and considered it all, and we think that the judgment for the defendants is in all respects proper.

It is urged as first proposition, but here considered as a second proposition, that the burden was upon the defendants, because the proof showed a confidential relation be-

tween the father and his sons, John and Will; that defendants must not only meet the burden and the presumption against them, but they must show that the entire transaction was conscientious. The relation of father and son of itself does not establish confidential relations. What we have said heretofore indicates what we now repeat, that the old man ran his own business, or, to put it negatively, that neither John nor Will, nor anyone else, conducted the business of John D. Hamlin. That is the proof from many witnesses and from innumerable circumstances in this case. To rehearse them would make this opinion too long. If, then, John D. Hamlin was not only able to, but did, transact his own business in the making of these deeds, we cannot conceive it to be the duty of defendants to show that the grantor had consulted with a lawyer or with anyone else with reference to these transfers. This was his property accumulated by the efforts of a lifetime, and he transferred it to those whom he wished to make the objects of his favor. The general finding by the trial court for defendants properly included a finding that no confidential relation existed, and this finding has abundant support in the evidence. There was no fraud, no overreaching, no secrecy, and no badge of wrong-doing. This was not a very valuable estate at the time of its transfer. It was agricultural land, and a great deal of it was populated with black-jacks and blowsand. It had perhaps a mineral lease value of $1 or $2 per acre; there was no oil or gas in the neighborhood; but it will be noted the old man reserved these mineral rights during his lifetime. Many months thereafter oil was discovered in the vicinity, and there was considerable appreciation in values. If the grantor had lived that long, he would perhaps have reaped the benefit of this sudden rise. The old gentleman had the right, under our law, to perfect a deal with his own property in his own way, if he were competent to do so. Nobody seems to contend that he did not understand that, when he made a deed to his property, it was an irrevocable transfer, and he could not get it back. Many witnesses, even of plaintiffs, indicate that the old man certainly understood that.

Men grow old, and with advancing years become physically feeble. They very frequently have their idiosyncracies, and their habits may be peculiar due to loneliness or lack of attention, but somehow it seems to us that it is not strange that one who has lived a long time and has accumulated by his thrift and sacrifice should prefer that those who are round about him and who had been helpful and friendly and natural and who need and will appreciate his benefactions, should have them.

A piece of testimony was offered which tends to discredit Mr. Hamlin and which we shall not discuss in detail, except to say that it purports to have occurred several years before the making of these deeds, and the circumstances were discreetly kept within the family all this time. The skeleton was not dragged out until the old man was gone and must default in making answer, and when a small amount of his property is sought in a lawsuit by those who it seems to us might have done well to keep their secret. We are not going to discuss Mr. Hamlin's morals. His record of a long life is unchallenged, save by detailing this episode by those of his family who now seek an advantage from disclosing what family pride had prevented their disclosing before. We do not pretend to know the facts, except as shown in this evidence, but whether this evidence was properly excluded or not, we feel that justice has been done.

These deeds, except the one conveying the additional 40 acres to John A., were upon consideration of $1 and love and affection. Each deed reserved to the grantor "the use, income, rents, profits, oil and gas royalties and rentals during his lifetime". Forty acres was given to each grantee, but John A. bought for $500 an additional 40. Under the proof we doubt if this land was worth more than $20 or $25 per acre, even if sold in fee simple absolute. John's extra 40 appears perhaps to have been even less valuable. These reservations argue the foresight and prudence of the grantor.

It is contended that the defendants had the burden of meeting certain legal presumptions. It is clear that they have offered proof on every phase of this controversy, and, instead of presumptions, the trial court had before it the facts, and this court, upon appeal, has the same facts. The trial court was satisfied upon the showing made with his judgment, and we, in reviewing it, are also satisfied of the correctness of the trial court's judgment, and we hold that it is not against the clear weight of the evidence, and the same is affirmed.

HALL, EAGLETON, DIFFENDAFFER, and TEEHEE, Commissioners, concur.

By the Court: It is so ordered.

Note.—See "Appeal and Error," 4 C. J. §2869, p. 900, n. 96. "Deeds," 18 C. J. §551, p. 443, n. 19; §552, p. 445, n. 34; §554, p. 447, n. 46. "Equity," 21 C. J. §720, p. 584, n. 73.